IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

NAKIYA MORAN,

               Plaintiff,

v.

CALUMET CITY, CALUMET CITY OFFICER
MITCHELL GROWE, CALUMET CITY OFFICER
KEVIN RAPACZ, CALUMET CITY CST MARIO
GLUMAC.

               Defendants.

Case No. 1:17-cv-02027

Assigned Judge: Robert W. Gettleman

Designated Magistrate Judge: Jeffrey Cummings

**PLAINTIFF'S L.R. 56.1 STATEMENT OF ADDITIONAL FACTS
IN RESPONSE TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Now comes Plaintiff, NAKIYA MORAN, by and through his counsel and pursuant to L.R. 56.1, submits the following statement of facts in response to Defendants motions for summary judgment (Doc. No**.** 184 and 187):

1.     Plaintiff Nakiya Moran ("Nakiya" or "Plaintiff") was released from custody on February 18, 2017, after spending almost ten and-a-half years in prison for the crimes of attempted murder, crimes he did not commit. (Exhibit 1, Complaint ¶ 74; Exhibit 3, Order Granting Certificate of Innocence pg.1, ¶ 4). Nakiya's arrest and subsequent imprisonment stems from a shooting that occurred at the Rostro family home on August 22, 2006.

**Rostro Family and Their Gang Affiliation**

2.     In 2006, the Rostro family included the father Tomas Rostro, mother Flora Rostro, oldest son Eduardo Rostro (age 17), daughter Yadira Rostro (age 16) and youngest son Edwin

Rostro (age 14). (Exh. 1, Complaint ¶ 19). The family lived in single-family home located at 1451 Kenilworth Drive, Calumet City, Illinois. (Exh. 1, Complaint ¶ 14).

3.     In 2006, there were five "prominent" street gangs located in Calumet City including the Latin Kings, Latin Dragons, Gangster Disciples and Four Corner Hustlers. (Exhibit 9, Det. Rapacz deposition pg.17:12-22).  Eduardo Rostro ("Eduardo") and Edwin Rostro ("Edwin") had joined the Latin Kings street gang sometime in 2005 or 2006. (Exhibit 11, Nakiya Moran deposition pg.37:21-24; Exhibit 10, Det. Growe deposition pg.39:3-3-10; Exhibit 62, CCPD Rostro gang **reports pg.1-??).**

4.     Yadira Rostro's ("Yadira") boyfriend at the time was Fernando Sandoval and he was also a member of the Latin Kings street gang. (Exhibit 12, Eduardo Rostro deposition pg.45:13-46:24). Yadira was affiliated with the Latin Kings and she would wear the gang's "colors" of black and gold. (Exh. 11, pg.41:1-18, 43:7-13)

5.     In the spring and summer of 2006, there was ongoing "gang war" between the Latin King and Latin Dragon street gangs. (Exhibit 10, Det. Growe deposition pg.30:3-17). The two gangs were "intermingled" in the area of Calumet City where the Rostro home was located. (Exh. 10, p.g32:1-22), Yadira testified that Eduardo was having "problems" with other gang members in the months leading up to the August 22, 2006 shooting. (Exhibit 13, Yadira Rostro deposition pg.23:23:24:22)

6.     In fact, Yadira and Edwin confirmed that their father Tomas Rostro's ("Tomas") vehicle had been set aflame prior to the August 22, 2006, shooting (Exhibit 13, Yadira Rostro deposition pg.25:16-Exhibit 16, Edwin Rostro deposition pg.29:4-8). Yadira also recounted that the Rostro home had been shot at four to five separate times in the months prior to the August 22, 2006 shooting. (Exh.13, Yadira dep. pg.18:9-15). The Rostro's admitted that Nakiya was never a

suspect in any of those incidents, and he never had any verbal or physical confrontations with the Rostro family prior to the shooting. (Exh. 13, Yadira dep. pg.74:1-9; Exhibit 16, Edwin deposition pg.28:4-7).

### Nakiya and Horatio "Bobby" Loera's Gang Affiliation

7.      In the spring of 2006, Nakiya was seventeen years old and was attending Thorton Fractional North High School in Calumet City. (Exhibit 11, Nakiya Moran deposition pg.5:16-17, 18:24-19:6). Nakiya's parents were divorced, and in August 2006, Nakiya was living at his father William Moran's home located at 17952 Rose Street, Lansing, Illinois. (Exh. 11, pg.82:11-12, 85:17-19; Exhibit 20, William Moran pg.16:2-6). Mr. Moran was employed by the Illinois Department of Veteran Affairs and was elected as a Cook County Commissioner from 1998-2002. (Exh. 20, pg.21:9-20, 22:8-11). Nakiya's mother Laurie Natzke was a registered nurse and lived with her husband at 1334 Greenbay Avenue in Calumet City. (Exhibit 19, Laurie Natzke deposition pg.10:1-5, 12:7-10)

8.      Nakiya joined the Latin Dragons street gang in 2005 because several of his close friends had previously joined the gang. (Exh. 11, pg.37:18-20, 39:10-13). Det. Growe testified that there were approximately 40-50 Latin Dragon gang members in the Calumet City area, including Horatio "Bobby" Loera ("Loera") (age 19) (Exh.10, Growe dep. pg.31:7-12; Exh. 11, pg.160:18-161:8).

9.      The Calumet City Police Department ("CCPD") had a Gang Investigation Unit. (Exhibit 21, Officer Casey Erickson deposition pg.60:13-15). On February 28, 2006, CCPD Gang and Tactical Officer Casey Erickson completed a "Gang/Field Interview Card" detailing his questioning of Loera at Thorton Fractional High School. (Exhibit 61, CCPD February pg.1-2; Exh. 21, pg.60:13-15).

10.     At that time, Loera informed Officer Erickson that he was at the high school "looking for Latin Kings" after one of his fellow Latin Dragons was shot and killed by Latin Kings. (Exh. 61, pg.2). The "interview card" went on to state that CCPD officers had previously caught Loera "with a gun looking for Kings". (*Id.*)

11.     On April 17, 2006, Loera along with two other individuals were seated in a vehicle parked in the vicinity of 136 155th Place, Calumet City, Illinois. (Exhibit 62, Loera April 17, 2006 shooting pg.1). At that time, a suspect shooter identified as Ray Cortez opened fire on their vehicle, wounding Loera along with the two other occupants of the vehicle. (Exh. 62, pg.1). Ray Cortez was the leader of Latin Kings in the Calumet City area. (Exh. 9, Det. Rapacz dep.19:23-20:1).

**Eduardo and Amanda Torres Relationship**

12.     Eduardo was in a "serious relationship" with Amanda Torres ("Torres") for three or four months during the spring and summer of 2006. (Exh. 12, Eduardo dep. pg.65:5-10; Exh. 13, Yadira dep. pg.107:2-8; Exhibit 15, Flora Rostro deposition pg.15:24-16:3). In fact, Eduardo and Torres were dating up until a "couple" weeks prior to the August 22, 2006 shooting. (Exh. 13, Yadira dep. pg.106:20-107:1).

13.     Eduardo was "friends" with Loera and the latter had been to the Rostro home approximately four times. (Exh. 13, Yadira dep. pg.108:3-6; Exh. 16, Edwin dep. pg.21:1-13). However, Torres cheated on Eduardo with Loera, and the two got into an "argument" over Torres shortly before the August 22, 2006 shooting. (Exhibit 14, Tomas Rostro deposition pg.16:3-17:3; Exh. 13, pg.108:3-18).

**August 22, 2006**

14.     On August 22, 2006, Amber Mendoza ("Mendoza") (age 14) was at her home which was located approximately four blocks away from the Rostro family home. (Exhibit 17,

Amber Mendoza deposition pg.5:17-18, 27:9-13, 64:16-23). At the time, Mendoza lived with her mother Gail Peterson, her step-father "Glen" and her eleven year-old sister Marissa. (Exh. 17, pg.7:5-17). Mendoza went to the same middle-school and high school as Yadira and Edwin. (Exh. 17, pg.10:12-16, 11:19-20). Mendoza was "really good friends" with Yadira and had been to the Rostro home more than one-hundred times, including sleepovers. (Exh. 17, pg.14:14-15:7).

15.     Around noon that day, Mendoza's friends Elizabeth Outlaw ("Outlaw") and Brittany Powell ("Powell") were dropped off at her home. (Exh. 17, pg.27:14-23; Exh. 12, pg.83:19-20). Powell was dating Nakiya at the time and was pregnant with his child. (Exh. 17, pg.15-19). At Powell's request, Mendoza's mother Gail then drove the girls in her black Jeep Cherokee to pick-up Nakiya from his home in Lansing. (Exh. 17, pg.27:24-28:14).

16.     Mendoza, Outlaw, Powell, Nakiya and her sister Marissa remained at the Mendoza home for the remainder of the afternoon. (Exh. 11, pg.83:19-84:10; Exh. 17, pg.29:24-30:8). Mendoza confirmed that her mother was home the entire day. (Exh. 17, pg.16-19).

### Rostro 6:00 p.m. Shooting

17.     At approximately 6:00 p.m., Eduardo, Edwin, Sandoval and Carl Jenkins ("Jenkins") left the Rostro home and were driving to Sandoval's nearby home. (Exh. 16, Edwin dep. pg.35:20-36:23; Exh. 12, Eduardo dep. pg.75:7-11). Sandoval was driving while Edwin was in the front seat and Eduardo and Jenkins were in the backseat. (Exh. 16, pg.36:3-23).

18.     The vehicle was positioned at a stoplight only a couple blocks away from the Rostro home when someone shot at the vehicle. (Exh. 16, pg.37:10-21). Although Edwin did not see the shooter, he testified that within seconds Jenkins yelled out that "Bobby" [Loera] was the shooter. (Exh. 16, pg.38:1-22). Jenkins lived close to Sandoval and knew Loera prior to this shooting. (*Id.* at pg.39:2-9).

19.     CCPD Officer Raymond Hladek ("Officer Hladek") was dispatched to the shooting and authored an "Incident Report" (Case #06-60567) detailing his conversation with witness Maria G. Ayala at her home located at 1395 Burnham Avenue, Calumet City, Illinois. (Exhibit 53, CCPD Report of 6:00 p.m. shooting pg.1-2). Ms. Ayala relayed that she observed the suspect "standing by her garage, pointing [a] gun toward the west as if to be shooting at someone" across the street. (Exh. 53, pg.2). Ms. Ayala described the shooter as a male, age 17-25 years-old, that was wearing a black baseball hat and black White Sox shirt. (*Id.*)

20.     Ms. Ayala further informed Officer Hladek that the shooter then entered a "dark colored car" before fleeing the scene northbound through the alley located at Burnham Avenue and Hirsch Avenue, and directly behind Ms. Ayala's home. (Exh. 53, pg.2). Officer Hladek recovered nine (9) spent 9mm Luger shell casings at the scene and inventoried them under No. 06-1344. (*Id.*)

21.     CCPD Officer Jody Faulkner ("Officer Faulkner") referenced the 6:00 p.m. shooting in his report regarding the 9:00 p.m. shooting, by stating "Eduardo advised that Nakiya shot at him and his brother earlier today in the area of Burnham and 164th St. (SEE CASE #06-30567). I asked him why they didn't call the police then. He advised that they didn't think of it because no one got hit. In both cases there were 9-9mm shell casings recovered". (Exhibit 56. CCPD Incident Reports pg.4).

22.     The lead investigators assigned to the Rostro shooting were CCPD Detective Kevin Rapacz ("Det. Rapacz") and Detective Mitchell Growe ("Det. Growe"). (Exhibit 10, Det. Growe deposition pg.11:14-23). Despite Officer Faulkner's report detailed above, Det. Rapacz and Det. Growe claim they were unaware that there was a possible link between the 6:00 p.m. and 9:00 p.m. shootings. (Exh. 10, pgs.55:20-56:7; Exhibit 9, Det. Rapacz deposition pg.27:2-28:1).

23.     Det. Rapacz and Det. Growe also deny ever speaking with Officer Hladek about his report of Ms. Ayala's identification of the 6:00 p.m. shooter. (Exh. 9, Det. Rapacz pg.27:2-4; Exh. 10, Det. Growe dep. pg.52:2-5). Finally, Det. Rapacz and Det. Growe deny ever speaking with Ms. Ayala regarding her observations or attempting a photo-array to determine if she could identify Nakiya or Loera as the shooter. (Exh. 9, 27:5-10; Exh. 10, 52:23-53:1)

### Torres and Loera 8:30 p.m. "drive-by" of the Rostro Home

24.     The Rostro home was located on the Northeast corner of Kenilworth Drive and 164th Street. (Exhibit $$, Google Imaging photographs August 2007 pg.1-&&). The front of the home faces Kenilworth Drive in an easterly direction. (Exh. $$, pg.$$). The Northside of the home faces 164th Street with a driveway and basketball hoop at the western most part of the property. (Exh. $$, pg.$$)

25.     At approximately 8:30 p.m., Yadira testified that she observed Torres driving her vehicle by their house approximately twenty (20) minutes prior to the 9:00 p.m. shooting. (Exh. 13, Yadira dep. pg.56:2-11). Yadira recognized Torres' vehicle by the gold color and dark tinted windows. (Exh. 13, pg.56:18-20). Flora confirmed that she observed Torres driving by the house prior to the 9:00 p.m. shooting, and was told by her children "to be careful". (Exh. 15, Flora dep. pg.28:2-29:1).

26.     Eduardo also observed a vehicle drive by the house approximately thirty (30) minutes prior to the 9:00 p.m. shooting. (Exh. 12, Eduardo dep. pg.80:19-81:2). In contrast to Yadira and Flora, Eduardo testified that this vehicle was a "dark colored Honda" with a loud muffler. (*Id.*). Eduardo responded by putting a brick on the top of his father's vehicle so he could throw it at Torres' vehicle if they were attacked. (Exh. 38, Eduardo 2009 trial testimony pg.37:7-14).

27. At approximately 8:45 p.m., Tomas, Flora, Eduardo, Yadira and Edwin were gathered outside the home along 164th Street. (Exh. $$, %%). Also present was Eduardo's friend Kimothy Hill (age 16) and Yadira's friend Desiree Dolata (age 13) along with several other friends and family. (Exhibit, 71, Kimothy Hill 2009 trial testimony pg.2:17-18, 9:17-21; Exhibit 18, Desiree Dolata deposition pg.5:16-17, 9:21-25).

28. Kimothy Hill ("Hill") lived in a home two blocks from the Rostro home and was good friends with Eduardo. (Exh.71, pg.4:21-24). In fact, Hill had been to the Rostro home "more than a hundred times" over the years. (Exh.71, pg.61:21-62:8). At the time of his trial testimony, Hill was an active member in the United States Army and had the rank of Private First Class as a "combat medic", and was a Licensed Practical Nurse or "LPN". (Exh. 71, pg.8:6-12).

29. At the 2009 trial, Hill was shown various photographs of the scene including one that depicted the light pole in the alley behind the Rostro's garage. (Exh. 71, pg.58:19-59:9). Hill confirmed that the light pole in the alley only provided light to "the middle of 164th Street" and did not provide light past the large pine tree immediately west of the driveway. (Exh. 71, pg.60:21-61:16).

30. At approximately 9:00 p.m., Hill left the Rostro home and proceeded to walk westbound on 164th Street for three blocks when he observed a vehicle traveling eastbound on 164th Street towards the Rostro home. (Exh. 71, pg.67:18-69:10). Hill described it as a black "compact" vehicle with a "loud" muffler and the windows down. (*Id.* at pg.69:11-12, 71:5-8, 79:5-6).

31. Hill recounted that the occupants "threw-up a gang sign at me" before continuing eastbound on 164th Street. (*Id.* at 71:16-19). More importantly, Hill confirmed that he had known Nakiya four or five years and did not see him in the vehicle. (*Id.* at pg.76:21-77:5).

**Rostro 9:00 p.m. Shooting**

32.     At approximately 9:00 p.m., Tomas, Flora and Edwin were standing near the south curb of 164th Street on the north side of their home. (See Exh. PHOTO1 and 2). Eduardo was standing near the fence door leading to the backyard and Yadira was standing with Desiree near the driveway along 164th Street. (Exh. 12, Eduardo dep. PHOTO).

33.     At that time, the shooter "peeped his head from around the bushes" and began firing from across the street towards the crowd. (Exh. 38, Eduardo 2009 trial testimony pg.4:18-22; Exh. 12, pg.99:23-100:3). The bushes were immediately adjacent to the neighbor's garage that was approximately eighty (80) feet to one hundred (100) feet away from the witness/victims' positions. (Exh. 33, Loftus report pg.2).

**Eyewitness Misidentification**

34.     Plaintiff has presented the report and testimony of Dr. Geoffrey Loftus, a "widely-published and globally-recognized expert in the field of human perception and memory". (Exhibit 32, Dr. Loftus deposition; Exhibit 33, Dr. Loftus report pg.1-14); *quoting People v. Lerma*, 2016 IL 1148496 at *25, 47 N.E.3d 985, 990 (January 22, 2016). Dr. Loftus has co-authored eight textbooks, approximately 110 articles, and has been qualified to testify at trial as an expert in perception and memory more than four hundred and sixty (460) times. (Exh. 33, pg.1).

35.     Dr. Loftus evaluated Yadira and Eduardo's ability to observe the assailant based on the lighting, distance, divided attention, stress, and duration at the time of the shooting. (Exh. 33, pg.6-9). Dr. Loftus opined that it was impossible for Eduardo and Yadira to identify the shooter based on the conditions and circumstances of that night. (Exh. 32, pg.53:23-54:2).

36.     Dr. Loftus opinions were based on victims'/witnesses' own testimony, markings on trial/deposition exhibits to determine the location of the witnesses/shooters at the time of the

occurrence, measurements of the distances between theses points and Dr. Loftus' site visit in early September 2019 at the same time the shooting occurred. (Exh. 33, pg.1; Exh. 32, pg.34:11-17).

37.     Based on testimony and the marked exhibits, Tomas, Yadira and Eduardo were approximately sixteen (16) feet, eighty-three (83) feet and ninety-nine (99) feet from the shooter at the time of their identification. (Exh. 33, Loftus report pg.2).

38.     The first purported light source was a streetlight located in the alley north of 164th Street which was approximately 115 feet north of the shooter's position. (*Id.*). The second purported light source was a streetlight in the alley south of 164th Street approximately 72 feet south of the shooter's position. (*Id.*). The third purported source of light was the one affixed to the garage approximately fifteen (15) feet west of the shooter's location. (Exh. 32, pg.91:1-20).

39.     Tomas had known Nakiya for years considering he was friends with Eduardo and had been to their home. (Exh. 14, Tomas Rostro dep. pg.25:2-9; Exh. 12, Eduardo dep.110:20-111:2). Tomas recalled standing on 164th Street next to his vehicle and speaking with Flora and Edwin. (Exh. 14, pg.45:15-18). When the shooting began, Tomas responded by pushing his wife and son to the ground. (Exhibit 68, Tomas Rostro 2009 trial testimony pg.6:15-7:16; Exh. 14, pg.45:15-18, 47:2-5).

40.     Tomas felt something "hit" his back before he heard Yadira screaming "daddy, I am shot." (Exh. 68, pg.7:10-8:4). Tomas then looked towards the alley and source of the shooting. (Exh. 68, pg.7:8-8:20; Exh. 14, pg.47:10-24). According to Tomas, he ran towards the assailant while he was still firing the weapon and came approximately 16 feet away from the shooter who was "hiding behind" the garage. (Exh. 68, pg.8:15-20, 17:6-8; Exh. 14, pg.48:16-18, 51:8-10).

41.     From that distance, Tomas had an unobstructed view of the shooter's face and described him as a young Asian male who was wearing glasses and a baseball hat. (*Id.* at pg.53:6-

54:6, 66:1-12). Tomas then saw the shooter "run down the alleyway" before he observed shell casings on the ground. (Exh. 68, pg.10:10-24).

42.     Yadira testified once the shooting started, she ran away from the shooter and towards the front of the home. (Exhibit 39, pg.31:4-21; Exhibit 13, Yadira dep. pg.75:18-21). Yadira heard three (3) shots before she was struck by a bullet(s) and fell down on the grass several feet from the curb. (Exh. 39, pg.31:4-21, 36:4-6; Exh. 13, at pg.78:7-24)

43.     Yadira attempted to get up and run but she was physically unable to do so. (*Id.* at 79:9-24). Instead, Yadira reached towards her back and realized that her hand was covered in blood and she began to "freak out and scream for my dad" before she went into "shock". (*Id.*).

44.     It was not until then that Yadira looked over her shoulder and back towards the shooter who was still behind the bush. (*Id.* at 80:13-18). The shooter had the weapon raised near his face and continued to fire resulting in "flashes" each time. (*Id.* at 81:21-82:6). Yadira acknowledged that she was "mostly worried about trying to get myself up and take cover" but allegedly saw Nakiya's face for a "couple seconds". (*Id.* at 84:24-85:7).

45.     Eduardo testified that he was standing on the sidewalk directly in front of the fence gate. (Exh. 12, Eduardo dep. pg.86:15-24; Exhibit 38, Eduardo 2009 trial testimony pg.3:9-15). At that moment, Eduardo observed the shooter "peep his head out from a bush that was in the alley" next to the garage. (Exh. 38, Eduardo 2009 trial testimony pg.4:18-22; Exh. 12, pg.99:23-100:3). Eduardo could not see anything below the shooter's shoulders, and only could see his face because he "was still behind the bushes hiding when he began to shoot". (*Id.* at pg.100:4-8; Exh. 38, pg.15:20-22).

46.     Eduardo admitted that he only saw the shooter's face for a "couple of seconds" before he raised the gun and Eduardo began running away from the shooter towards the front of

the house. (*Id.* at 101:20-102:17). Eduardo testified that he could actually feel the "heat" of the bullets passing by him as he fled the scene. (Exh. 38, pg.23:16-21)

47.    Eduardo admitted there was a tree directly between him and the shooter and that the streetlight located south of the shooter did not illuminate him. (Exh. 12, pg.101:5-13, 144:20-22). Tomas planted the trees and estimated they were ten (10) feet high August 2006. (Exh. 14, Tomas dep. pg.124:6-15).

48.    As stated above, Desiree Dolata was thirteen at the time of the shooting and had been friends with Yadira for approximately nine (9) years. (Exh. 18, Desiree dep. pg.9:21-25). Dolata also had known Nakiya for four (4) years, and had seen him approximately twenty (20) times over that time period. (Exh. 18, pg.12:13-13:3).

49.    On August 31, 2007, Dolata provided a sworn deposition to Nakiya's criminal defense attorney Frank Celani ("Celani") regarding her observations the night of the shooting. (Exhibit 72, Dolata 2007 deposition). Dolata was initially questioned regarding the purpose of her deposition, to which she responded "I showed up basically, I guess the person lied about Nakiya, saying he saw him". (Exh. 7, pg.6:2-6).

50.    Dolata confirmed that she was standing near Yadira when the shooting began, they both were facing west, or towards the front of the house. (Exh. 72, pg.17:1-3, 21:16-22:6). Once Desiree heard the gunshots she and Yadira began running towards the front of the house before Yadira fell to the ground and started screaming. (Exh. 72, pg.24:4-25:5).

51.    At that moment, Desiree was also struck by a bullet(s) which wounded her thigh and hand (*Id.* at pg.25:1). Desiree looked towards the alley when the shots began, and after she fell to the ground wounded. (*Id.* at pg.33:24-34:24; 45:2-47:16). Desiree did not see the shooter either time. (*Id.*). Desiree never heard Eduardo or Yadira identify Nakiya as the shooter at the scene. (*Id.*

at pg.35:18-36:8). Instead, Eduardo accused Nakiya of being the shooter the next day. (*Id.* at pg.39:5-21).

52.     Dolata subsequently authored a sworn affidavit on September 25, 2012. (Exhibit 70, Dolata 2012 Affidavit). Once again, Dolata "agree[d] to stand up in court and state the facts I did not see Nakiya Moran at any given time coming out of the alley or standing by the alley or shooting from the alley". (Exh. 70, pg.1).

**Lighting**

53.     Dr. Loftus opined the witnesses would have been using their "scotopic visual system" based on the time of night and insufficient artificial lighting. (Exh. 33, Loftus report pg.6). As a result, the witnesses would have been "incapable of detecting either color or the fine detail necessary to encode a person's appearance." (*Id.*; Exh. 32, Loftus dep. pg.106:16-21).

54.     Dr. Loftus testified that based on the testimony, trial exhibits and his site visit, the streetlights north and south of the shooter would not have sufficiently illuminated the shooter. (Exh. 32, pg.113:3-9). CST Glumac and Mendoza both testified that the light coming from the streetlight located near the Rostro driveway did not cast light across 164th Street. (Exhibit 67, CST Glumac 2009 trial testimony pg.82:14-83:11; Exhibit 17, Mendoza dep. pg.16:10-17:1)

55.     The streetlight north of the shooter's position would not have illuminated the shooter because it was one hundred and fifteen (115) feet away and would have only illuminated the back of his head. (Exh. 32, pg.113:3-9). During Dr. Loftus' site visit the garage light was illuminated and he had either the plaintiff's investigator and/or attorney stand in the position of the shooter, while he stood in both Yadira and Eduardo's respective positions. (Exh. 32, Loftus dep. pg.92:15-93:15). Dr. Loftus determined the garage light would not have "sufficiently"

illuminated the shooter because the shooter was around the corner of the garage. (Exh. 32, pg.94:12-19, 106:16-21).

**Distance**

56.     Dr. Loftus discussed that at "longer distances a witness is less able to perceive the fine details of a person's appearance that would allow them to correctly recognize that person". (Exh. 33, pg.7). Dr. Loftus further discussed how "scotopic" vision will decrease an individual's ability to see a person from long distances. (*Id.*). In other words, "seeing a person from 100 feet away at night would lead to the visual information loss attributable to distance as seeing the person from a distance of 3 x 100 = 300 feet during the day". (*Id.* at pg.7, 14)



| 16 feet (Tomas) | 83 feet (Yadira) | 99 feet (Eduardo) |

**Information available to the scotopic visual system from three distances**

**Divided attention**

57.     Dr. Loftus discussed how a witness' "attention is divided when many aspects of the environment compete for attention". (Exh. 33, pg.7). Dr. Loftus provided several examples of when a witness' attention can be divided during a shooting including fleeing from the scene, avoiding injury, attempting to assist others to avoid injury and "weapon focus". (*Id.* at 7-8). Dr.

Loftus opined that both Eduardo and Yadira experienced virtually all of these factors including attempting to flee or escape, attempt to avoid injury or further injury, concern for their family members and focus on the weapon being fired. (*Id.* at 8).

**Stress**

58.     Dr. Loftus discussed how "mental functioning during a high-stress experience is poorer than mental functioning during a moderate-stress experience". (*Id.* at 8; Exh. 32, pg.126:7-130:24). Dr. Loftus detailed how the significant stress experienced by Eduardo who was fleeing the scene in fear of his life, and Yadira who was wounded and in "shock", would have negatively affected their ability to accurately observe the shooter. (*Id.* at 8; Exh. 32, pg.126:7-18)

**Duration**

59.     Dr. Loftus discussed the importance of the duration an eyewitness observed the shooter when determining their ability to form an accurate memory. (Id at 9). Dr. Loftus relied on Eduardo and Yadira's testimony that they observed the shooter for a matter of seconds during the incident. (*Id.* at 9). Finally, Dr. Loftus opined that Eduardo and Yadira's identification of Nakiya as the shooter was based on the "false memory" or assumption that "he was either involved in the prior shooting or was a passenger in the getaway vehicle". (Exh. 33. pg.10).

## CCPD Response and Yadira's Alleged Identification

60.     Det. Rapacz and Det. Growe were allegedly the first officers on the scene and the paramedics arrived "a few minutes" later. (Exh. 9, Det. Rapacz dep. pg.46:2-16; Exh. 10, pg.77:16-22). Det. Growe confirmed that the paramedics treated Yadira immediately upon their arrival and transported her from the scene "a minute, minute and half" later. (Exh. 10, pg.78:6-12, 79:21-80:2).

61.     Det. Growe claims that he had a conversation with the wounded and pregnant Yadira during the "minute or two" before the paramedics arrived. (Exh. 10, pg.81:4-17). During this conversation, Yadira allegedly stated that "Nakiya" was the shooter. (*Id.* at 18-21).

62.     Det. Growe's original "Incident Report" filed on August 29, 2006, stated that Eduardo allegedly identified "Nakiya Moran" as the shooter. (Exhibit 56, CCPD Incident Reports pg.8). Det. Growe's report also detailed his conversation with Jesus and Solomon Rostro, both of whom stated they could not identify the shooter because they were behind a fence. (*Id.*). Det. Growe's original incident report and case note(s) failed to mention Yadira's on scene statement. (*Id.*).

63.     On May 27, 2008, a status hearing on the criminal case took place where ASA Lorain Lynott ("ASA Lynott") informed the court that a CCPD detectives failed to generate a "supplemental report" regarding Yadira's alleged on-scene identification of Nakiya as the shooter. (Exhibit 50, May 27, 2008 hearing pg.2:16-3:12).

64.     On May 27, 2008, Det. Growe generated an "Incident Report" which stated, for the first time, that Det. Growe and Det. Rapacz "spoke with victim Yadira Rostro and asked her if she know [sic] who shot her. She said that 'Nakiya had shot her". (Exhibit 58, CCPD May 27, 2008 report pg.1; Exh. 10, pg.124:8-17, 126:16-19).

65.     On October 16, 2008, Nakiya's motion to suppress Yadira's photo-array identification was heard before Judge Michele Pittman. (Exhibit 51, October 16, 2008 Motion to suppress hearing pg.1-84). At the hearing, Det. Rapacz testified that Yadira had allegedly identified "Nakiya" as the shooter while she was wounded and bleeding at the scene. (Exh. 51, pg.21:6-22). Det. Growe subsequently testified that Yadira allegedly identified "Nakiya" as the shooter at the scene. (Exh. 51, pg.37:10-22).

66.     Yadira was then called to the stand and was explicitly asked whether she had "any conversations with anyone about who shot your prior to seeing this photo array", to which she responded "just the officers ... in the hospital the next day". (Exh. 51:19:23). Yadira also confirmed that she knew Nakiya's last name prior to the photo-array on August 23, 2006. (Exh. 51, pg.64:14-16). Judge Pittman ultimately denied Nakiya's motion to suppress.

67.     In August 2009, Det. Rapacz was called to testify at Nakiya's first jury trial. (Exhibit 65, Det. Rapacz 2009 trial testimony). Det. Rapacz testified that when he arrived on the scene he spoke with the "female victim Yadira" and the "witness" Eduardo, and they both identified Nakiya as the shooter. (Exh. 65, pg.5:5-21).

68.     On cross-examination from defense counsel, Det. Rapacz once again confirmed that he spoke with Yadira on the scene. (*Id.* at pg.32:13-23). On re-direct examination, Det. Rapacz testified for a third time that he spoke with a "bleeding" victim on the scene and alleged that Yadira identified Nakiya as the shooter. (*Id.* at pg.33:4-11, 34:2-6).

69.     Yadira also testified at the 2009 jury trial and was questioned regarding her interactions with CCPD officers at the scene and at the hospital. (See generally Exh. 39, Yadira 2009 trial testimony). Once again, Yadira testified that she "first identif[ied] [Nakiya] to the police as the shooter at the hospital". (Exh. 39, pg.21-23, 34:6-16).

70.     Finally, Yadira testified at her 2018 deposition that the first time she spoke with a "plainclothes officer" or detectives was at St. James Hospital on August 23, 2006. (Exh. 13, pg.92:3-21).

Q.     The first time you recall speaking to a plainclothes officer detective was the next day when they asked you about the shooting and you participated in the photo array?

A.     Yeah, they asked me if it was okay if they asked me a couple questions. I told them I really wasn't up for it but, yeah, that would be okay. (Exh. 13, pg.94:14-20).

## CCPD Dispatch Logs

71.     CCPD has a central "Dispatch" system that received 911 calls and relayed that information and assignments to officers in the field. (Exh. 10, Det. Growe dep. pg.57:13-20). The Dispatch system also recorded the information provided by the officers on the scene of a crime in a "Log", and relayed that relevant information to other officers. (*Id.*) Det. Growe and Det. Rapacz acknowledged that officers responding to a crime scene provide Dispatch relevant information. (Exh. 10, pg.58:1-6; 34:17-22). Det. Growe testified to the following:

Q.     The whole point of investigating a crime is to find out who did it, right?

A.     Correct.

Q.     Arguably, the most important information that could be part of an investigation is if a victim identified the shooter, correct?

A.     Correct.

Q.     So you would agree that if you were provided the identity of the shooter at the scene by a victim, that would be important information that you would relay to dispatch?

A.     Yes. I would typically put that over the air and let the other officers know. (Exh. 10, pg:59:21-60:13).

72.     Det. Rapacz confirmed that if a shooting victim provided the responding officers the name of offender, the officer(s) would then relay that information to the Dispatch:

Q.     Well, in this case you have an individual who [was] shot nine times, hit three different victims, including two teenage girls, one who was pregnant, correct?

A.     Yes.

Q.     And when you got to the scene, there was no offender there, correct?

A.     Correct.

Q.     And there was no gun recovered, correct?

A.     Correct.

Q.    So as far as you knew when you arrived, there was a shooter who just shot three people who took the gun and was on the streets. Fair?

A.    Yes.

Q.    So in those circumstances, would you agree with me that it would be important to provide a victim's identification of the shooter to dispatch so other officers assigned to Calumet City would be able to be on the lookout for that offender?

A.    Yes. (Exh. 9, Det. Rapacz dep. pg36:10-37:8)

73.    The CCPD Dispatch Log related to the Rostro shooting had twenty-five (25) separate typewritten entries. (Exhibit 55, CCPD dispatch log pg.1-4). The first timed log entry was at 9:11 p.m. and stated "2 VICTIMS SHOT AT 1451 KENILWORTH". (Exh. 55, pg.1). Det. Growe then relayed to dispatch "TOMAS AND HIS DAUGHTER HIT IN THE HIP, ALONG THE SIDE OF THE HOUSE PER 184 [Det. Rapacz] WE HAVE 3 SHOOTING VICTIMS UNKN WHO WAS DOING THE SHOOTING PER VICTIM 1 F VIC IS PREGNANT PER 159 [Det. Growe]". (*Id.* at pg.2).

74.    A Dispatch Log entry at 9:37 p.m. stated "PER 191 SUSP VEH UPDATE VEH POSS A HATCHBACK TINTED WINDOWS GRN COLORED". (*Id.* at pg.2). Another entry at 9:37:24 p.m. stated "LS [last seen] WB [westbound] 163rd THEN TURNED ON WENTWORTH". (*Id.*). Finally, an entry at 9:44 p.m. read "SUSP VEH SMALL GRN 2 YOUNGER HM [Hispanic Male] LS [Last Seen] NB WENTWORTH … RX 868-9012". (*Id.*).

75.    The final CCPD officer call to dispatch was at 10:44 p.m. (*Id.* at pg.4). Therefore, the CCPD Dispatch Log establishes that CCPD officer(s) were on the scene for approximately one and a half hours (9:11 p.m. – 10:44 p.m.). (*Id.* at pg.1, 4). During that time period, no CCPD officer(s) informed Dispatch that a victim identified Nakiya as the shooter despite Det. Rapacz statement that "everyone within our department pretty much knows and is familiar with Nakiya".

(Exh. 65, Det. Rapacz 2009 trial testimony pg.27:2-3). The CCPD Dispatch Log was never tendered to the CCSAO or Nakiya's criminal defense attorney.

**Eduardo's Alleged On-Scene Statements**

76.     On August 23, 2006, CCPD Officer Faulkner filed an "Incident Report" alleging that Eduardo was on scene and stated that "Nakiya Moran, had been driving around, as a passenger, his house earlier this evening in the suspect vehicle described as possibly being a Honda which was dark colored. The vehicle drove by the victim's house several times." (Exh. 56, CCPD Incident Reports pg.4). According to the report, Eduardo then stated that "Nakiya then entered the suspect vehicle and fled in an unknown direction" after the shooting. (*Id.*). Finally, Eduardo allegedly relayed that "Nakiya had shot at him and his brother earlier today in the area of Burnham and 164th St.". (*Id.* at pg.4).

77.     At the 2009 Jury trial, Eduardo denied ever telling the CCPD that he saw Nakiya "driving around, as a passenger, his house earlier" in the suspect Honda with a loud muffler. (Exh.38, Eduardo 2009 trial testimony pg.34:2-14; 44:2-8). In fact, Eduardo testified several times that he only "assumed" that Nakiya was a passenger in the Honda with the loud muffler. (Exh. 38, pg.36:12-14; 37:5-6, 42:8-11, 42:19-20).

78.     Eduardo's also testified at the 2016 retrial where he admitted that he never actually saw Nakiya in the Honda with the loud muffler prior to the shooting. (Exh. 40, pg.41:7-12). Eduardo was then shown his August 24, 2006, handwritten statement that was authored by ASA Voight and signed by him. (Exhibit 54, Eduardo HW statement pg.4). Defense counsel read Eduardo the following excerpt from the statement "[m]y dad and I walked over to the alley. I didn't see Nakiya anymore, but I heard a car pull away. It sounded like the Honda Civic that I had seen

Nakiya riding in earlier that night." (Exh. 54, pg.3-4). Defense counsel attempted to impeach Eduardo through the following exchange:

Q.  You told the State's Attorney and the detective that the defendant was in that are earlier that night, didn't you?

A.  Yes.

Q.  You lied to them, didn't you?

A.  No, I said I wasn't sure.

Q.  Did you tell them you weren't sure?

A.  Yes. That's not what I wrote, but that's what I told them. (Exh. 40, pg.43:18-44:2)

### Tomas Rostro Photo Identification at Advocate Christ Hospital

79.  As stated above, Tomas ran directly towards the offender as shots were being fired and had an unobstructed view of his face from only sixteen (16) feet away. (Exh. 14, Tomas dep. pg.48:16-18, 51:8-10). Tomas was able to describe the gender, race, age, height and clothing of the shooter. (Exh. 14, pg.53:6-54:6, 66:1-12).

80.  Tomas testified that he was questioned by Det. Rapacz and Det. Growe while at Advocate Christ Hospital. (Exh. 9, Det. Rapacz dep. pg.66:22-67:20; Exh. 14, Tomas dep. pg.64:5-13). Tomas confirmed that the detectives showed him printed photographs of potential suspects, but he was unable to positively identify the shooter as one of the individuals in the photographs. (Exh. 14, pg.65:14-67:9)

81.  Defendants' own police procedures expert Jack Ryan agreed that Det. Rapacz and Det. Growe were required to document Tomas' failure to identify the suspect through photographs. (Exhibit 36, Jack Ryan deposition pg.198:11-199:6)

Q.  Assuming these facts, Jack: Tomas Rostro knew Nakiya Moran from him visiting the house prior to the shooting; Tomas Rostro ran towards Nakiya Moran; Tomas Rostro got 16 feet away from Nakiya Moran; Tomas Rostro could identify his face; Tomas Rostro described

the shooter as a 5-foot young Asian with glasses -- assuming all those facts in this hypothetical, if Tomas Rostro failed to positively identify the shooter after being shown photographs by the detectives, would that be Brady material?

A.      I think if you put all of those facts in, including the fact that he's -- can identify, then yeah. I mean, obviously, if he said, "No, that was not Nakiya Moran. I know Nakiya Moran," then obviously that's obvious that would be Brady material. (*Id.*)

82.      Det. Rapacz and Det. Growe confirmed that they questioned Tomas at Advocate Christ Hospital after the shooting. (Exh. 9, Det. Rapacz dep. pg.66:22-24), However, Det. Rapacz claims that Tomas was never shown any photographs or photo-arrays. (Exh. 9, pg.67:16-18).

### **Desiree Dolata Mother Implicated "Shooters" and Amanda Torres**

83.      A CCPD "Case note" detailed Desiree' mother, Sue Dolata's, statement to the CCPD with the following:

"The mom of victim Dolata, Desiree is Dolata, Sue. She gave updated TX to be reached at 1st TX 219-712-3333 and 2nd 708-217-3198 she advised that while at the hospital with her DGHTR she was told that a [female] Companion with the shooters was a [female] nam/Torres, Amanda K 040589 who resides at 1367 Superior and is the DGHTR of a City employee. Mom wanted our OFCS to go to her home and question her per S60 advise mom that we will pass info on to investigators". (Exhibit 59, CCPD "Case Notes" pg.1)

84.      The CCPD "Case Notes" were a typed written document in the CCPD Moran criminal file. (Exh. 10, Growe dep. pg.94:6-95:8). However, Det. Growe and Det. Rapacz denied ever being informed of Sue Dolata's statements regarding multiple shooters and Torres being with the offenders at the time of the shooting. (Exh. 10, pg.94:6-95:8; Exh. 9, Det. Rapacz dep.64:2-16, 65:15-66:1). Det. Rapacz confirmed that if they were provided the actual name of a suspect that would be important information that should have been documented in a report. (Exh. 10, Exh. 9, pg.65:10-66:1).

85.      There is no testimony or documentation to suggest that the CCPD "Case Note" detailing Sue Dolata's statement was ever tendered to the CCSAO verbally or in written form.

Similarly, there is testimony or documentation to suggest that Nakiya's criminal defense attorney was never provided Sue Dolata's statement.

### August 23, 2006 St. James Hospital

86.     Tomas was released from Christ Hospital in the early morning of August 23, 2006 before he went to St. James Hospital in Olympia Fields, Illinois ("St. James") to visit Yadira and the rest of the family. (Exh. 14, Tomas dep. pg.63:2-22). Tomas arrived at St. James at approximately 5:00 a.m. and spent "a couple" hours with Yadira before he went back home. (Exh. 14, pg.67:22-68:11).

87.     Tomas came back to St. James later that morning where he met with Eduardo, Yadira and Edwin. (*Id.* at pg.70:3-17). Tomas was asked if Yadira or Eduardo identified Nakiya as the shooter at the hospital and he provided the following responses.

Q.     Did [Yadira] tell you who she thought the shooter was?

A.     At that time? At the hospital, no. (*Id.* at pg.69:8-10).
…
Q.     When you were at the hospital, Olympia Fields, Eduardo never told you that he saw Nakiya Moran was [sic] the shooter, correct?

A.     I don't remember him saying that.

Q.     He asked you to describe the shooter for him?

A.     All three asked me to describe, and then we came to the conclusion it was him is – that's what we call – we were talking in the waiting room.

Q.     When you say you came to the conclusion that it was Nakiya, you mean you, Yadira, Edwin and Eduardo came to that conclusion?

A.     Yes. (*Id.* at pg.74:16-75:4)

88.     Tomas was further questioned whether Eduardo was able to physically describe the shooter while the group was talking at St. James Hospital. (*Id.* at pg.72:23-73:2).

Q.     Did Eduardo say he saw the shooter?

A.      I don't know if he said that at the time, but they went by the description that I give them how the shooter looked like.

…

Q.      Eduardo asked you to describe the shooter because he couldn't describe the shooter?

A.      See, I was down facing the street. Eduardo was running towards this way while he was shooting. I do know if he saw him or not.

Q.      Eduardo never told you while you were at [St. James] that he actually saw Nakiya as the shooter, correct?

A.      He was running at the time of the shooting. I do not know if he saw him. You might want to ask him. But in [St. James], he asked me what do I saw [sic].

## Yadira's Photo-Array Identification of Loera

89.      Det. Growe and Det. Rapacz conducted a photo-array with Yadira at St. James Hospital on August 23, 2006 at approximately 3:15 p.m. (Exhibit 74, CCPD Photo-array reports pg.1). The first photo-array involved Yadira's identification of Nakiya as being involved in the August 22, 2006 shooting at 9:00 p.m. (Exh. 74, pg.2).

90.      The second photo-array involved Yadira's identification of Loera as the individual "standing in the alley" with Nakiya. (Exh. 74, pg.5; Exhibit 75, CCSAO Felony Review documents pg.5-6). Yadira, Det. Growe and Det. Rapacz all confirmed at their depositions that their signatures and/or initials were affixed next to Loera's photograph in the photo-array. (Exh, 74, pg.95:21-24; Exh. 10, Det. Growe dep. pg.131:8-18). Yadira also admitted that it was "possible" she told Det. Growe and Det. Rapacz that she saw Loera in the alley at the time of the shooting. (Exh. 74, pg.97:5-17). Yadira went on to state that "I think I remember [Eduardo] saying something about [Loera]. I'm pretty sure I think I remember him saying something about him". (*Id.* at pg.97:21-24).

91.      As previously discussed, Yadira, Det. Growe and Det. Rapacz all testified at Nakiya's 2008 Motion to Suppress Yadira's photo-array identification of Nakiya. (Exhibit 51,

October 16, 2008 Motion to suppress hearing pg.1-84). At the hearing, neither Yadira, Det. Rapacz nor Det. Growe testified that Yadira was involved in a second photo-array of Loera. (See generally Exh. 51)

92.     Yadira and Det. Rapacz both testified at Nakiya's 2009 jury trial and his 2016 retrial. Again, neither Yadira nor Det. Rapacz mentioned that Yadira had identified a second suspect in the alley at the time of the shooting. (*See generally* Exh. 39, 41, 65, 66). The witnesses also failed to testify that Yadira identified Loera in a second photo-array. (*Id.*)

93.     At their 2018 depositions, Det. Growe and Det. Rapacz were shown a six (6) person photo-array that included Loera's photograph. (Exh. 10, Det. Growe dep. pg.131:8-18; Exh. 9, Det. Rapacz dep. pg.81:19-82:4). Det. Growe and Det. Rapacz confirmed that they never generated a report regarding Yadira's photo-array identification. (Exh. 9, pg.84:2-6; Exh. 10, pg.133:3-8). The detectives also admitted that they never informed any Assistant State's Attorneys about the second photo-array. (Exh. 9, pg.84:11-85:16). Finally, Det. Rapacz confirmed that Yadira did not inform Felony Review ASA Voight regarding her identification of Loera in the second photo-array. (Exh. 9, pg.89:1-10).

94.     Det. Rapacz admitted that if he was informed by Yadira that Loera was "at the scene and/or in the alley that would have been very important information in relation to the case" that he would have "documented in a report". (Exh. 9, pg.89:11-24). More importantly, Det. Rapacz agreed that he "would have been obligated to turn that [report] over to the State's Attorney". (*Id.*). Similarly, Det. Growe also acknowledged that "if there was a potential second shooter or individual at the scene with Nakiya Moran at the time of the shooting, that is an extremely important fact that [he] would have detailed somewhere in the record". (Exh. 10, pg.135:16-21).

95.     Cook County Assistant State's Attorney ("ASA") Cordelia Coppleson ("ASA Coppleson") was the "first-chair" that prosecuted the 2009 Jury trial. ASA Coppleson had no recollection of ever being tendered or seeing the photo-array of Yadira identifying Loera as being in the alley at the time of the 9:00 p.m. shooting. (Exhibit 23, ASA Coppleson deposition pg.185:15:20). ASA Coppleson agreed that if Yadira had identified a second individual at the mouth of the alley at the time of the shooting that information would be relevant and should have be tendered to the criminal defense attorney. (*Id.* at pg.178:2-14).

96.     ASA Loraine Lynott ("ASA Lynott") was "second-chair" for 2009 Jury trial. ASA Lynott stated that she was never tendered a photo-array of Yadira identifying Loera as being in the alley at the time of the 9:00 p.m. shooting. (Exhibit 24, ASA Lynott deposition pg.50:5-51:11). ASA Lynott further acknowledged that an eyewitness identifying an individual that was in the immediate vicinity of a shooting would be relevant, would be considered *Brady* material, would be exculpatory and would need to be tendered to the criminal defendant or his attorney. (Exh. 24, pg.51:3-52:11)

### CCPD Arrest and 26-Hour Interrogation of Torres and Loera

97.     On August 23, 2006, at 7:59 p.m., a CCPD officer searched Amanda Torres' name, identifying information and address through the department's computer system. (Exhibit 57, Torres and Loera arrest reports pg.4-5). Torres was subsequently placed under arrest by CCPD Officers Richie and Officer Kwiatkowski on August 23, 2006, at 8:10 p.m. at the location of 111 Warren Street, Calumet City, Illinois. (Exh. 57, pg.1; Exh. 9, Rapacz dep. pg.92:23-94:11).

98.     The only CCPD report documenting Torres' arrest was an "Arrest Sheet" indicating Det. Growe as the "Complainant" and Torres was arrested for "Investigation of an Aggravated Battery. (Exh. 57, pg.1; Exh. 9, pg.13-15).  There were also two CCPD "Miranda Warnings" sheets

that indicated Torres and Loera were read their Miranda rights at approximately 8:30 p.m. and 8:50 p.m., respectively. (Exh. 57, pg.2-3; Exh. 9, pg.97:22-98:7). Torres and Loera were under arrest and in CCPD custody from August 23, 2006, at approximately 8:30 p.m., until August 24, 2006, at 11:00 p.m. (Exh. 57, pg.1; Exh. 9, pg.97:22-98:24).

99.     Det. Growe and Det. Rapacz have no recollection of their interrogation of Torres or Loera, and they have no recollection of investigating Torres or Loera's possible whereabouts at the time of the 9:00 p.m. shooting. (Exh. 9, pg.96:3-20; Exh. 10, Growe dep. pg.134:12-135:6). Det. Growe acknowledged that if someone was arrested and questioned regarding the Rostro shooting, that event should be documented in a report and tendered to the prosecution. (Exh. 10, Growe dep.102:9-18). Det. Rapacz acknowledged that the arrest and questioning of Loera for more than twenty-four (24) hours was consistent with Yadira identifying him as being in the alley at the time of the shooting.

Q. Does that kind of connect the dots now, that why you would have held Horacio Lorea for 24 hours because a victim identified him as at the scene of the shooting?

A. Could be, yes. (Exh. 9, Rapacz dep. pg.144:10-14)

100.     ASA Coppleson confirmed that she never received the Arrest Sheet or Miranda Warnings sheet related to Torres and Loera. (Exh. 23, ASA Coppleson pg.183:5-184:9, 185:15-20). ASA Coppleson indicated that if the CCPD took two individuals into custody for questioning regarding an attempt murder, the circumstances of the custody and questioning should have been documented in a police report and tendered to the CCSAO. (Exh. 23, pg.184:16-185:13).

101.     In addition, numerous witnesses that were long-time friends with Torres testified at their respective depositions that they did not know she had been taken into custody, let alone arrested and interrogated for a twenty-six hour (26) time period. (Exh. 11, Nakiya dep. pg.170:3-7; Exh. Dolata dep. pg.80:18-23; Exh. 12, Eduardo dep. pg.125:15-126:23; Exh.16, Edwin

dep.73:14-22). In fact, Mr. Celani took a sworn statement from Torres and she never disclosed the fact that she had been arrested and interrogated regarding her involvement in the August 22, 2006, shooting.

## CCSAO Felony Review

102.     Plaintiff has presented the expert report and testimony of Attorney Robert Milan, who is a nationally recognized former prosecutor and First Assistant in the Cook County State's Attorney's Office at the time of Nakiya's arrest and prosecution. (Exhibit 35, Milan Report pg.1) In that role, Mr. Milan was ultimately in charge of all CCSAO criminal prosecutions – including Nakiya's case - and was thoroughly familiar with the Felony Review and discovery process.

103.     Mr. Milan explained that it was the accepted custom and practice of the CCSAO that the ASA assigned to the Felony Trial Division would copy and tender the defendant's statement contained in the Felony Review folder. (Exhibit 34, Milan deposition pg.105:17-106:18). In this case, Nakiya's statement to the Felony Review ASA was copied and tendered to the defense.

104.     Mr. Milan went on to state that the Felony Review or Felony Trial ASA's would not copy and tender the statements from victims/witnesses contained in the Felony Review folder. (*Id.*). Instead, any victim/witness statements should be documented in a police report and tendered to the prosecution to review and disclose. (Exh. 34, pg.105:22-106:10).

105.     ASA Coppleson and ASA Lynott both confirmed that the only information from the Felony Review Folder tendered to the criminal defendant is "any statements made by the defendant, and that's all that I would understand from the felony review documents". (Exh. 23, ASA Coppleson dep. pg.22:4-15; Exh. 24, ASA Lynott pg.78:10-80:16). ASA Coppleson and

ASA Lynott also expected any such statements to be "in the police reports" and then they would be tendered to the defense. (Exh. 23, pg.8:17; Exh. 24, pg.147:4-21).

106. Mr. Milan explained that the IBIS "Hit Sheet" in no way placed the CCSAO or the prosecuting ASA assigned to the Moran case on notice that there was a ballistic match between the Rostro shell casings, the October 22, 2006, Macias shooting and the weapon recovered from Nicolas Chavez on October 26, 2006. (Exh. 35, pg.152:9-19).

107. Mr. Milan pointed out that this two-page IBIS "Hit Sheet" did not include the following: Nakiya Moran's name, Moran's criminal case number, Moran's courtroom, the name(s) of the ASA assigned to the Moran case, no confirmation that there was a ballistic match and no confirmation on what evidence was involved. (*Id.*). Finally, Mr. Milan pointed out that the IBIS Hit Sheet was addressed to ASA Brian Holmes' administrative assistant and there is no evidence the CCSAO actually received this document. (*Id.*).

108. Mr. Milan acknowledge there was a handwritten entry in the CCSAO "Blue Back" or working notes that referenced the possibility that CCPD took other individuals into custody. Specifically, the entry read as follows:



109. Mr. Milan rejected defense counsel's assertion that this one-off note placed the CCSAO or prosecutors on notice that defendants arrested two suspects and interrogated them over a twenty-six (26) hour time period. (Exh. 34, pg.109:4-110:14). Mr. Milan emphasized that it was

the investigator's responsibility to generate and tender a report regarding the arrest and interrogation of two suspects. (*Id.*).

110.     ASA Jamie Voight was assigned to the CCSAO Felony Review Unit. (Exhibit 22, ASA Voight deposition). On August 24, 2006, at approximately 8:15 p.m., ASA Voight arrived at the CCPD station after being assigned to review criminal charges against Nakiya and she finished her assignment on August 25, 2006 at 12:45 a.m. (Exh. 22., pg.27:14-:28:3, 29:23:30:2). ASA Voight documented information she obtained from the detectives on a document called a "Felony Review Folder" ("Folder") (Exh. 22, pg.23:17-24:8)

### Illinois State Police Ballistics Report

111.     On December 31, 2008, Illinois State Police ("ISP") Forensic Scientist Leah Kane ("FS Kane") was asked by the CPD to perform a ballistics analysis through the Integrated Ballistics Identifications System ("IBIS") of a nine-millimeter hand-gun recovered from Nicholas Chavez ("Chavez") (Hispanic Male, 18 yo, 5'7, 157 lbs.) on October 26, 2006. (Exhibit 28, ISP FS Kane deposition pg.26:8-27:19).

112.     FS Kane's initial analysis indicated there was a "possible" ballistic match between the Chavez weapon and the shell casings recovered from the shooting of Juan Macias – an admitted Latin King game member - on October 22, 2006, at 1329 Calumet Avenue in Hammond Indiana. (Exh. 28, pg.43:5-9; Exhibit 49, Hammond PD 2006 Report Macias shooting pg.3-4). The suspect in Macias shooting was male Hispanic that was 5'7 tall and 160 lbs. and member of the Latin Dragons. (Exh. 49, pg.3-4). FS Kane's initial analysis also indicated a "possible" ballistic match between the Chavez weapon and the Rostro shell casings. (Exh. 28, pg.31:5-9)

113.     On January 7 2009, FS Kane called CST Glumac and explained that the Rostro shell casings were a potential ballistics match with a weapon used in another crime, and she

requested that he resubmit the shell casings for analysis. (Exhibit 7, ISP Reports pg.13; Exh. 28, pg.33:11-34:7). On January 13, 2009, FS Kane called CST Glumac again and left a voicemail requesting that he resubmit the Rostro shell casings for analysis. (Exh. 7, pg.14; Exh. 28, pg.34:16-35:5).

114.    On April 15, 2009, CST Glumac finally submitted the Rostro shell casings to the ISP laboratory for analysis. (Exh. 5, Glumac dep. 124:15-21). On May 12, 2009, ISP Forensic Scientist Jeffrey Parise ("FS Parise") submitted a report to CST Glumac indicating that the shell casings from both Rostro shootings were fired from the same weapon. (Exh. 7, ISP Reports pg.25-26; Exh. 28, pg.50:2-10.

115.    On May 22, 2009, FS Kane called CST Glumac and informed him that the Rostro shell casings were fired from the same weapon recovered from Chavez. (Exh.28, pg.38:8-23). FS Kane also received CST Glumac's approval to send the Moran ballistic reports to law enforcement agencies responsible for the Macias and Chavez matter. (*Id.*). Finally, CST Glumac "requested copies of the [other agencies] reports to fax number 708 868 1219". (*Id.*)

116.    On June 9, 2009, FS Kane faxed CST Glumac ten (10) pages of reports detailing the ballistic match between the shell casings recovered from the Rostro and Macias shooting, and the weapon recovered from Chavez. (Exhibit 77, June 9, 2009 ISP facsimile to CST Glumac pg.1-10). Importantly, all three ISP reports were addressed and sent to the respective police officers that requested the testing be completed. (Exh. 77, pg.2-7). None of the reports were addressed to the prosecutor, nor was the prosecutor designated to receive a courtesy copy ("CC").

117.    CST Glumac subsequently claimed that he did not tender these reports to Growe or Rapacz despite their Star numbers being written on the reports, and despite CST Glumac never making a similar oversight in his nearly thirty-year career. (Exh. 8, pg.77:16-24, 78:14-79:4). CST

31

Glumac does not have an independent memory of failing to place the ISP report into Det. Growe and/or Det. Rapacz's mailbox. (*Id.* at pg.79:16-22). Instead, he assumes that he failed to do so because there was a lawsuit filed. (*Id.*).

118. The following exchange frames the context under which CST Glumac's allegedly "forgot" to tender the relevant ISP reports:

Q.  According to the documents we've gone over, you received a call or a message from Forensic Scientist Parise on January 7, 2009 regarding this case. You received a call from Forensic Scientist Leah Kane on January 13, 2009. You or your staff sent a 23-page fax of reports to the State's Attorney's Office on April 13, 2009. You physically dropped off the Moran evidence to the Illinois State Police on April 15, 2009. You received a call from Forensic Scientist Leah Kane on May 22, 2009. You received a fax from Leah Kane on June 9, 2009, and you picked up evidence in the Moran case on June 26, 2009. Assuming that's all established in the record, is it your testimony that despite all that contact with the State's Attorney's Office and the Illinois State Police regarding this specific report and whether there's an IBIS hit and match between the shell casings recovered from the Moran shooting and other instances, you forgot to tender these reports to Investigators Rapacz and Growe?

A.  Yes. (Exh. 8, pg.134:21-135:20).

119. ASA Coppleson denied ever speaking with FS Kane regarding a ballistic match between the Chavez weapon and the Rostro shell casings. (Exh. 23, pg.165:15-166:1). ASA Coppleson also does not recall receiving a voicemail from FS Kane regarding the report(s). (*Id.* at 166:6-9). Finally, FS Kane also denied ever speaking with ASA Coppleson regarding the reports. (Exh. 28, pg.101:17-102:20).

### CCSAO and Attorney Celani's Subpoenas to CCPD

120. In total, the CCSAO (11) and Attorney Celani (6) issued seventeen (17) separate subpoenas to the CCPD and their officers requesting them to produce any and all relevant documentation, which included, but was not limited to, the production of any witnesses statements, arrest reports, photo-array identifications and forensic laboratory reports. (Exhibit 60, CCSAO and Celani subpoenas to CCPD pg.1-17; Exhibit 35, Robert Milan expert report pg.5).

32

121.     The documents included numerous direct subpoenas to Det. Rapacz (5), Det. Growe (3) and CST Glumac (3) to appear in court with the requested documents. (Exh. 60, pg.1, 5-17). In particular, Attorney Celani issued personal subpoenas to Det. Rapacz and Det. Growe requiring them to tender "[a]ny and all reports records and other document" regarding "interrogation or questioning of any and all persons which in any way relate to the shooting". (*Id.* at pg.12-13). The CCSAO also issued a personal subpoena to Det.  Rapacz to "bring any photos and photo arrays and reports" to court. (Exh. 60, pg.1).

122.      Mr. Celani testified that he had no recollection as to why he did not call Amanda Torres to testify at trial. (Exhibit 29, Celani deposition pg.83:23-84:1). Moreover, Mr. Celani confirmed that he "did not remember" Horatio or Bobby Loera's "name at all". (Exh. 29, pg.85:4-13). At Mr. Celani's deposition he was shown the photo-array containing Loera's photograph with Yadira, Det. Rapacz and Det. Growe's signature next to Loera's photograph. (Exh. 29, pg.29:16-30:24). Mr. Celani confirmed that he had never been tendered the photo-array. (*Id.*)

123.     Mr. Celani also submitted a subpoena the CCPD requesting "[a]ny and all reports records and other document regardless of their nature reflecting in any way the gang affiliation of any person" the was a victim, witness or questioned regarding the shooting. (Exh. 60, pg.3). Mr. Celani was never tendered any CCPD reports or documents regarding Eduardo or Edwin's membership in the Latin King gang.

**Post-Conviction Petition**

124.     On April 24, 2015, Judge Pittman held an evidentiary hearing on Nakiya's Petition for Post-Conviction relief. (Exhibit 73, April 2015 PC hearing pg.1-2). ASA Coppleson testified that sometime in October 2010 CCPD Officer Casey approached her at the Markham Courthouse and informed her that there was a possible forensic match between the shell casings recovered

from the August 22, 2006, shooting and a weapon recovered at a later date. (Exh. 73, pg.9:21-10:6, 11:1-8).

125.    ASA Coppleson responded that she would need more information and requested that Officer Erickson provide the relevant reports. (*Id.* at pg.11:1-8). ASA Coppleson called the CCPD several times to re-request the documents and finally received them on November 15, 2010. (*Id.* at pg.11:9-14). One of the reports received was the May 19, 2009 ISP ballistics report that forensically matched the August 22, 2006, shell casings to the handgun recovered from Latin Dragon gang member Nicholas Chavez. (*Id.* at pg.11:15-12:16).

126.    ASA Coppleson confirmed that she did not have this information or report prior to the August 2009 Jury trial. (*Id.* at pg.12:21-23). On November 15, 2010, the same day, ASA Coppleson sent the reports to Nakiya's criminal defense attorney Celani and wrote a letter addressed to Appellate Public Defender Alan Goldberg who was representing Nakiya on his appeal at the time. (*Id.* at pg.13:1-6).

127.    Chicago Police Officer Ralph Palomino was also called to testify regarding the circumstances of his arrest of Nicolas Chavez. (Exh. 73, pg.16). On October 26, 2006, Officer Palomino responded to a dispatch call of "shots fired" from a dark colored Cadillac with tinted windows. (*Id.* at pg.17:13-17, 18:15-21). Officer Palomino traveled to where the shots occurred on the southeast side of Chicago near the border of Illinois and Indiana, and only a five (5) minute drive from Calumet City. (*Id.* at pg.19:2-18). Officer Palomino assisted in curbing a vehicle that matched the description provided above and upon approach, observed Nicholas Chavez seated in the front passenger seat. (Exh. 73:20:8-19).

128.    A 9mm handgun was recovered from the front passenger seat area before Chavez admitted that he "put the gun there. We just got finished shooting at some [Latin] Kings". (*Id.* at

34

pg.21:5-14, 24:1-3, 26:5-7). Officer Palomino subsequently placed Chavez under arrest for unlawful possession of a weapon. (*Id.* at pg.26:5-10). Chavez was an eighteen (18) year old Hispanic male that was 5'7 tall and 155 lbs. and self-admitted Latin Dragons gang. (Exhibit 48, CPD 2006 Chavez reports pg.2). Chavez lived in Hammond, Indiana, and was arrested in June 2008 in Calumet City. (Exh. 48, pg.2; Exh 73, pg.50:3-8, 54:23-2).

129.    CST Glumac was then called to testify and he admitted that ISP FS Leah Kane spoke with him over the telephone on May 22, 2009. (*Id.* at pg.33:12-19). According to CST Glumac, FS Kane informed him that she submitted Rostro shell casings into the IBIS system and determined that these casings were fired from the weapon recovered from Chavez on October 26, 2006. (*Id.* at pg.33:16-35:6).

130.    In fact, FS Kane specifically informed CST Glumac that the offender was arrested by the CCPD and his name was "Chavez". (*Id.*). CST Glumac also admitted that he received the relevant ISP reports from FS Kane via facsimile on June 9, 2009. (*Id.* at pg.35:10-23). CST Glumac claimed that he failed to follow CCPD protocols requiring him to forward the report to the investigators assigned to the Rostro shooting, and also failed to forward the reports to the CCSAO. (*Id.* at pg.36:13-37:1).

131.    CST Glumac acknowledged that he spoke with the prosecuting ASA's prior to him testifying at the August 2009 Jury trial. (*Id.* at pg.37:5-23). Nonetheless, CST Glumac failed to inform the ASA(s) or the criminal defense attorney of the ISP reports, the Chavez arrest or the ballistic evidence linking the shell casings to the weapon recovered from Chavez. (*Id.*)

132.    On June 26, 2015, Judge Pittman conducted an analysis as to whether CST Glumac's failure to tender the ISP Reports constituted a violation of *Brady v. Maryland*. (Exhibit 70, Judge Pittman 2015 post-conviction ruling pg.4). First, Judge Pittman affirmatively held that

the CCSAO generally - and ASA Coppleson specifically - never had possession of the ISP reports prior to November 2010. (Exh. 70, pg.4:6-13). In particular, Judge Pittman held "when Ms. Coppleson received this information from the police she turned it over immediately. And the reason she did that is because she has an ethical obligation to do that…I am not stating that the State did anything improper in the way they handled this case". (*Id.*)

133.    Second, Judge Pittman held the ISP report linking the shell casings recovered from the August 22, 2006, shootings to Chavez was "clearly favorable to the defendant". (Exh. 70, pg.4:4-18). Third, Judge Pittman held the ISP report was "material to the defendant's guilt". (*Id.* at pg.4:23-5:2).

134.    Finally, the Court held the defendant was prejudiced because this was "an identification case" and the ISP report would have provided the "opportunity to a jury an alternate suspect, someone else who could have done this shooting". (*Id.* at pg.5:11-17). Judge Pittman found "what is disturbing to this Court is Officer Glumac testified in this trial knowing that he had the report and knowing that the State did not have it." (Exh. 70, pg.7:1-3).

## 2016 Retrial

135.    On February 17, 2017, Judge Pittman found Nakiya not guilty of all charges. (Exhibit 42, Judge Pittman 2017 retrial ruling). The Court began by emphasizing that Tomas Rostro had known Nakiya prior to the shooting, he looked directly at the shooter, and yet he was unable to identify the shooter at trial. (Exh. 42, pg.3:18-4:2).

136.    The Court then stated that Eduardo suffered "grave impeachment" where he originally "assume[d]" that Nakiya was in the vehicle with the "loud muffler" circling the area prior to the shooting. (Exh. 42, pg.4:9-15, pg.5:6). Judge Pittman believed Eduardo's "identification [was] tainted" because "if he assume[d] he saw the Defendant in the car that he

further assumed that it was the defendant who did the shooting". (*Id.* at pg.4:23-5:1). The Court went on to surmise that Eduardo may also have tainted Yadira's identification by telling her Nakiya was the alleged shooter. (*Id.* at pg.5:3-4).

137.     The Court contrasted the above "evidence" with Nakiya's two alibi witnesses, the lack of any physical evidence linking him to the crime and the ISP report that linked the weapon to another Latin Dragon that matched Nakiya's race, age, hair color, height and weight. (*Id.* at pg.5:21-6:9)

**ASA Ronald Park**

138.     ASA Ronald Park was assigned to investigate and prosecute the 2016 retrial of Nakiya. (Exh. 25, pg.74:1-7). ASA Park graduated law school in 2004 and was a prosecutor with the CCSAO for thirteen years. (Exh. 25, pg.7:12-8:2). In 2016, ASA Park was a "second-chair" in Judge Pittman's felony courtroom. (*Id.* at 10:12-11:6).

139.     ASA Park recalled Eduardo suffering two major impeachments at the second trial. (Exh. 25, pg.30:1-31:14). The first impeachment involved a contrast between Eduardo's handwritten statement, and his testimony at the retrial. In his handwritten statement, Eduardo stated that Nakiya was in the vehicle that drove around the Rostro family home prior to the 9:00 p.m. shooting. (Exh. 25, pg.30:1-24). However, at the retrial Eduardo testified that he "assumed" Nakiya was in the vehicle seen driving by the house prior to the shooting. (*Id.* at pg.30:8-17).

140.     ASA Park acknowledged there were numerous "obstacles" to proving Nakiya's guilt beyond a reasonable doubt. (Exh. 25, pg.45:3-12). The first obstacle was Tomas Rostro's failure to identify Nakiya as the shooter despite knowing him, despite having an unobstructed view of the shooter and despite having the closest view of the shooter. (Exh. 25, pg.48:1-12).

141.     The second obstacle was the fact that Eduardo was "severely impeached" by providing a handwritten statement alleging that he saw Nakiya in the suspect vehicle prior to the shooting, but later admitted at the retrial that he only "assumed" Nakiya was in the vehicle at that time. (Exh. 25, pg.48:14-23, 51:4-6). According to ASA Park, the third obstacle was Yadira's identification occurred after she had been shot three or four times in the back and she was lying face down on the ground. (Exh. 25, pg.53:21-54:9).  The fourth obstacle was the fact that Desiree Dolata was a victim and witness that knew Nakiya, but provided sworn statements that he was not the shooter. (Exh. 25, pg.55:

142.     As with the previous two prosecutors assigned to Nakiya's criminal case, ASA Park confirmed that he had never seen the photo-array depicting Yadira's identification of Loera as being at the scene of the 9:00 p.m. shooting. (Exh. 25, pg.58:16-59:15). ASA Park went on to agree that any such photo-array would be relevant, that it should have been tendered to the defense pursuant to *Brady* and it would be considered exculpatory evidence. (Exh. 25, pg.59:16:61:12).


Respectfully submitted

NAKIYA MORAN

By:     /s/  *Michael L. Gallagher*                           __

One of His Attorneys

Michael L. Gallagher
ARDC #6281432
WISE MORRISSEY, LLC
161 N. Clark. Suite 3250
Chicago. IL 60601
(312) 580-2040
mlg@wisemorrissey.com
ny@wisemorrissey.com