IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| NAKIYA MORAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17 C 2027 |
| | ) | |
| v. | ) | |
| | ) | Judge Robert W. Gettleman |
| CALUMET CITY, Calumet City Officer | ) | |
| MITCHELL GROWE, Calumet City Officer | ) | |
| KEVIN RAPACZ, Calumet City CST MARIO | ) | |
| GLUMAC | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Nakiya Moran brought an eight count wrongful conviction amended complaint against Calumet City, Calumet City Police Officers Mitchell Growe and Kevin Rapacz (jointly as the "CCPO defendants"), and Calumet City Evidence Technician Marco Glumac. Count I alleges a due process violation based on defendants' alleged violation of Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose to plaintiff certain exculpatory evidence. Count II alleged a claim for supervisor liability against the individual defendants. Count III alleged a civil conspiracy under 42 U.S.C. §§ 1985 and 1986. Counts IV through VI are state law claims for malicious prosecution, intentional infliction of emotional distress ("IIED"), and conspiracy. Counts VII and VIII are brought against Calumet City, alleging respondeat superior liability under the state law claims, and indemnification under the Illinois Tort Immunity Act, 745 ILCS 10/9-102. On August 16, 2017, the court dismissed Counts II, III, and V, leaving Count I (due process), Count IV (malicious prosecution), Count VI (common law conspiracy), and Counts VII and VIII (respondeat superior and indemnification) as the remaining claims. Glumac and the

CCPO defendants have filed separate motions for summary judgment on the remaining counts. For the reasons described below, both motions are granted.

Before setting out the relevant factual background, the court must address the parties L.R. 56.1 filings. Although the parties have filed the required L.R. 56.1 statements and responses, plaintiff's filings are largely deficient. His responses to the CCPO defendants' statement of facts contains denials without citations to the record, improper legal arguments, and additional facts (without citation to the record) that are more properly presented in an L.R. 56.1(b) (3) statement of additional material facts. He did file a statement of additional facts, but that too is deficient, as it presents facts that are not support by the cited portions of the record.

His response to Glumac's statement of facts fares no better. In that response, he denies his own allegations contained in the operative complaint, presenting improper legal argument that the complaint was filed "less than five (5) weeks after Nakiya was found not guilty of all counts at his retrial. At that time, plaintiff had received no documents from the defendants or the Cook County State's Attorney's Office ("CCSAO"), had received no written discovery responses and had taken no depositions in this matter." That response is wholly improper. He cannot deny that the complaint contains the cited allegation. It is there in black and white. The place to argue the legal import of the allegation is in his response brief, not in his L.R. 56.1(b) response.

The result of plaintiff's deficiencies is that the court could strike plaintiff's responses in their entirety and deem defendants' statements admitted as true, which would likely result in victory for defendants. The court declines to take this drastic step, preferring to resolve the motion on its merits, rather than the deficiencies in the pleading described above. The court is

unable to trust the facts and, as a result, the argument presented in plaintiff's submissions, however, forcing it to scour the entire record to determine the truly undisputed facts, precisely what the rule is designed to avoid. As the Seventh Circuit stated in Smith v. Lamz, 321 F.3d 680, 683 (7th Cir. 2003) (citations and internal quotations omitted):

> A district court is not required to wade through improper denials and legal argument in search of a genuinely disputed issue of fact. And a mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material. In short, judges are not like pigs, hunting for truffles buried in briefs.

## BACKGROUND[1]

In 2006, the Rostro family included father Tomas, mother Flora, Eduardo (age 17), daughter Yadira (age 16), and Edwin (age 14). They lived in a single-family home located at 1451 Kenilworth Drive, Calumet City, Illinois. Eduardo and Edwin were both members of the Latin Kings street gang. Yadira was affiliated with the Latin Kings, and her boyfriend Fernando Sandoval was also a member of the Latin Kings.

At that time plaintiff was 17 years old and attending Thornton Fractional North High School in Calumet City. He was living at his father William Moran's home located in Lansing, Illinois. Plaintiff was a member of the Latin Dragons street gang, a rival of the Latin Kings. Horatio "Bobby" Loera was also a member of the Latin Dragons.

At approximately 6:00 p.m. on August 22, 2006, Eduardo, Edwin, Sandoval and Carl Jenkins were driving to Sandoval's home. Sandoval was driving while Edwin was in the front seat and Eduardo and Jenkins were in the back seat. While at a stop light only a couple of

---

[1] These background facts are taken from plaintiff's admissions to defendant's L.R. 56.1 statement of facts as well as defendants' other statements supported by the record.

3

blocks away from the Rostro home, someone shot at the vehicle. Although Edwin did not see the shooter, he testified that within seconds Jenkins said that "Bobby" was the shooter. Jenkins lived close to Sandoval and knew "Bobby" [Loera] prior to the shooting. CCPO Raymond Hladek was dispatched to the scene, prepared an incident report and recovered nine spent MM Lugar shell casings at the scene and inventoried them under No. 06-1344.

That same day, at approximately 9:00 p.m., the Rostro family was gathered outside of their home playing basketball and talking. Across the street an individual came out from behind a bush and began shooting at them. The shooter struck three people, Yadira, her father Tomas, and a friend of the family, Desire Dolata, and then fled from the scene, leaving behind nine shell casings. After Yadira was shot, but before the perpetrator fled, she looked and had a view of the shooter's face.

Eduardo was outside with his family when he saw someone come from behind a bush across the street and start shooting. Eduardo also saw the shooter's face. At that time, both Eduardo and Yadira knew plaintiff because they had all attended the same middle and high schools. Eduardo and plaintiff had once been friends and plaintiff had been to the Rostro home.

Defendants Growe and Rapacz responded to the scene and were the detectives responsible for investigating the shooting. Glumac also responded to the shooting, to process the crime scene and collect physical evidence. Glumac recovered nine spent Winchester 9 mm shell casings, one piece of bullet jacketing, and one spent projectile which he packaged, sealed and placed in the evidence vault for further investigation. He then delivered the evidence to the Illinois State Police ("ISP") Division of Forensic Services, Joliet laboratory ("Joliet lab") for forensic testing to determine if all of the casings were expelled from the same firearm. The

4

Joliet lab was also asked to compare the Rostro evidence to open cases and to enter the data into the Integrated Ballistics Information system ("IBIS"), which is a computer program that analyzes ballistics evidence submitted to the ISP. The program analyzes data relating to firearms and fired evidence entered into the system from different crimes. If a "hit" is identified, a forensic scientist then physically examines the evidence to confirm the existence of a match. Glumac did not investigate the crime for suspects, did not interview any of the victims or witnesses, and had never spoken or interacted with plaintiff. Nor was he privy to any information regarding the alleged gang affiliations of the suspects, victims, and witnesses.

Growe and Rapacz, responding to a dispatch, arrived at the scene within three or four minutes of the shooting. Eduardo told them that plaintiff was the shooter. Calumet City Police Officer Jody Faulkner also responded to the call and wrote the initial incident report. Once on the scene, Faulkner spoke with Eduardo, who identified plaintiff as the shooter. Faulkner documented this identification in his report. Despite the report indicating that Eduardo had identified plaintiff as the shooter, it is undisputed that there was no identification of the shooter provided to the Calumet City Police Department dispatch.

The following day, August 23, 2006, Growe and Rapacz went to the speak with Yadira at St. James Hospital. Prior to leaving for the hospital, the officers generated a photo array at the police department using a system called "DC Book" which allows the officers to input plaintiff's relevant criteria into the program to generate photos of individuals with similar appearances, and fillers were chosen from the results. At the hospital, Yadira told the officers that she was standing near the sidewalk on the north side of her house when someone started shooting. She stated that she saw plaintiff standing across the street, north of her, near an alley, shooting a

5

handgun at her. After she identified plaintiff by name, Growe and Rapacz had her sign a line up advisory form and then showed her the photo array. Yadira immediately selected plaintiff, stated that he was the one who shot her, and signed her name on his picture to document the identification. Plaintiff makes no claim that the identification was overly suggestive or in any way improper.

Growe and Rapacz then met with Eduardo at the hospital where he was visiting his sister. Eduardo signed a line up advisory form, viewed a clean copy of the same photo array shown to Yadira, and identified plaintiff as the shooter.

Based on those identifications, plaintiff was arrested the following day outside his father's home in Lansing, Illinois. Following his arrest, he was brought to the police station where he told the officers and the prosecutor that he was at his dad's house at the time of the shooting. Jaime Voigt was the Cook County State's Attorney assigned to the felony review division who interviewed plaintiff. Each time an Assistant State's Attorney ("ASA") handles a case, the attorney fills out a felony review folder. The folders are maintained by the Cook County's State's Attorney's office ("CCSAO"), and the police do not have any control over the felony review folder or what is contained in it. That folder follows the case through all stages, including the bond hearing courtroom, preliminary hearing courtroom, and trial courtroom, so that each state's attorney handling the case has access to the information contained in the jacket. Any ASA trying a case has access to and should read the corresponding review folder and determine which portions of the folder are copied and given to the criminal defense attorney as part of the discovery process.

The felony review jacket in the instant case indicates that plaintiff was advised of his rights and gave a statement that he was at his dad's house at the time of the shooting, and that he did not shoot anyone. Voigt indicated, by circling portions of the form in the jacket, that Eduardo knew the defendant [plaintiff], identified the defendant through a photo array, and gave a handwritten statement. Voigt also wrote in the felony review folder that Yadira saw plaintiff shoot a gun at her and had identified plaintiff from a photo array, and that she knew him.

ASA Voigt also wrote in the jacket that Yadira had identified Horatio "Bobby" Loera as being at the scene, that there was no other evidence to support charges against Loera, and that Loera stated that he was at home. Voigt's notes indicated that Yadira was "standing outside when she saw defendant [plaintiff] and a guy named Horatio in alley."

ASA Voigt and Growe also met with Eduardo on August 24 at the hospital. Eduardo told Voigt what happened, and she wrote it down. Eduardo and Voigt then read through his statement, made corrections and Eduardo signed it. In that statement, Eduardo again identified plaintiff as the shooter.

The felony review folder indicates, and Voigt testified, that she and Growe also met with Yadira at the hospital on August 24. Yadira does not remember Voigt being there, but does remember meeting with the detectives. There is no question, however, that Yadira has consistently identified plaintiff as the shooter.

That same day ASA Voigt approved felony charges of aggravated battery and aggravated discharge against plaintiff. ASA Cordelia Coppleson was assigned as lead prosecutor for the criminal case. Every felony file contains a "blueback," which is a document prepared by the ASA on each file to allow any ASA working the file to get a history of what has taken place on

7

the case, such as what has been requested, who has been interviewed, what labs were ordered, what labs were received, what occurred on court dates, and other types of information. The April 20, 2007, blueback entry indicates that the ASAs handling plaintiff's prosecution wrote notes that another male and female were taken into custody because there was information that they drove plaintiff, but their alibis checked out. ASA Coppleson's notes indicate that these two individuals were Horatio Loera and Amanda Torres. The State's Attorney's office also prepared a case fact sheet on August 25, 2006, which contained notes that Yadira saw Horatio at the scene in the alley, but there was no other evidence to support the charges. The blueback indicates that on April 30, 2007, plaintiff's defense attorney, Frank Celani, was aware that there were two other individuals taken into custody during the investigation.

On August 31, 2007, Celani took a sworn statement from Desire Dolata (the third victim) and asked her questions about Loera and Torres, including whether Dolata saw them on the day of the shooting and if she knew that they had been arrested. Celani also took a sworn statement from plaintiff's girlfriend, Brittney Powell. He asked Powell if she was aware of the fact that Amanda Torres and Horatio "Bobby" Loera were arrested in connection with the shooting, and Powell stated that she was aware of the arrests and that she had discussed the arrest with Amanda Torres. On September 15, 2007, Celani took a sworn statement from Amanda Torres and provided a transcript of the statement to the prosecutors. In the instant case defendants issued subpoenas to both the CCSAO and to Frank Celani but neither could produce a copy of the sworn statement.

On August 17, 2009, Coppleson wrote in the blueback that based upon a conversation with Desire Dolata's mother, who stated she did not want Desire to appear in court, Coppleson decided to drop the charges against plaintiff for shooting Desire.

Prior to plaintiff's first criminal trial, Celani moved to suppress both in-court and out-of-court identifications. The court held an evidentiary hearing where Growe, Rapacz and Yadira Rostro all testified and were cross examined. Following the suppression hearing, Judge Simmons denied the motion to suppress, holding that nothing was unduly suggestive about the photo arrays.

Prior to the first criminal trial, Glumac was asked by Illinois State Police Forensic Scientist Jeffery Parise to resubmit the bullet evidence he had collected at the scene. Glumac submitted the shell casings, bullet jackets, and spent projectiles to the Illinois State Police ("ISP") crime lab. Parise then determined that the cartridge cases from 6:00 p.m. and 9:00 p.m. shootings were fired by the same gun and documented those findings in a May 11, 2009 report. He told Coppleson of the match that same day, and she received his report the following day.

Plaintiff's case was tried to a jury on August 18-24, 2009. Both Eduardo and Yadira identified plaintiff as the shooter. The jury found plaintiff guilty of five counts of attempted murder and two counts of aggravated battery with a firearm, and he was sentenced to 62 years in prison. He filed a notice of appeal on December 7, 2009.

Two months after the Rostro shooting, on October 26, 2006, Kurt Gonzalez, Nicholas Chavez, and Jaqueline Huerta were arrested in Chicago after a police officer allegedly saw one of them throw an object from a vehicle window. The recovered object was a handgun. On May 19, 2009, just three months prior to plaintiff's first criminal trial, ISP Scientist Leah Kane

prepared a lab report which describes a match between the casings recovered from the scene of the Rostro shooting and those recovered from the scene of another shooting in Hammond, Indiana, and the handgun recovered during the Chavez arrest. Kane prepared a second report, also dated May 19, 2009, regarding an "IBIS Case Association" between the Chavez case and the Moran case. That report indicates that the firearm that was recovered in the Chavez matter had been compared to and linked to fired evidence that was recovered in Hammond, Indiana that took place on October 22, 2006, and the same firearm was also linked to the fired evidence in the Rostro case. That IBIS Case to Case Association Report Indicates that ASA Brian Holmes was copied on the report. In 2009, ASA Holmes was the Deputy Supervisor of the Gang Crimes Unit in the CCSAO. He testified that under standard procedures, lab reports addressed to him were received by his secretary, who would check identifying numbers to determine whether the "hit" was associated with any pending criminal cases. If a case was identified, the secretary was charged with the responsibility of forwarding the report to the ASA assigned to the identified matter.

Glumac received the ballistic report from Kane on June 9, 2009. Pursuant to his standard operating procedure he wrote the star numbers of Investigators Growe and Rapacz on the report because he intended to forward it to them. Glumac testified that he must have neglected to actually forward the reports, but he does not remember not doing so. He simply assumes, because the instant case is pending, that he neglected to do so, surmising that he must have been interrupted by something that required his immediate attention. He also testified, however, that it was his understanding that ISP directly forwarded ISP forensic reports to the CCSAO. Kane, Parise and ASA Holmes all testified that the ISP labs send their reports directly

to the CCSAO. When Glumac received the report, he did not tell anyone about it. Rapacz first learned of the report in preparation for plaintiff's second criminal trial. Growe first learned of the existence of information linking plaintiff's case to a Chicago case from Detective Erikson after plaintiff's first trial and did not see the report until the instant litigation. Prior to plaintiff's first criminal trial, neither Growe nor Rapacz was ever made aware of the ballistic evidence matching the shell casings from the Rostro and Hammond shootings to the gun recovered during the Chavez arrest.

On May 19, 2009, Parise emailed Kane telling her to send a copy of the ballistics report to ASA Coppleson. Kane noted receipt of Parise's request and that she attempted to follow-up by requesting Coppleson's fax number. As of July 7, 2009, Kane indicated that she was unable to contact Coppleson after leaving several voicemails. Coppleson testified both at the post-conviction hearing and in this case that she never spoke with Kane and that she never received any message from her. Kane admitted that it was her responsibility to get the report to the ASA who needed it.

Kane's records indicate that she spoke with Glumac on May 22, 2009. She does not remember the conversation but testified that her practice was to inform an evidence technician of a ballistics match. In any event, it is undisputed that she sent Glumac the report on June 9th.

In October 2010, well after the conclusion of plaintiff's first criminal trial, Coppleson had a conversation with Calumet City Detective Erickson, who informed her that there was match of a shell casing in plaintiff's case to a gun recovered in another case. Coppleson told Erickson that she would like to see what he was talking about. Once Coppleson received the copy of the ballistic report showing the link between plaintiff's case and the Chavez case, which she claims

11

she had never previously received, she mailed a letter to the State Appellate Defender and to plaintiff's criminal defense attorney, Celani, on November 15, 2010, including a copy of the ballistic report. Neither the Appellate Defender nor Celani did anything with that report until after the Illinois Appellate Court upheld plaintiff's conviction on February 8, 2013.

On March 11, 2013, plaintiff filed a Petition for Post-Conviction Relief contending that the failure to turn over the ballistic report to plaintiff's criminal defense counsel constituted a Brady violation. The petition argued that the ballistic report, combined with "[t]he proximity of this shooting and Chavez's address in Hammond, Indiana, along with the similar appearance of the two men, bolstered the materiality of the undisclosed evidence. Since the petitioner presented an alibi defense and maintained this was a case of misidentification, there is a reasonable probability that the result of the proceeding would have been different had the evidence been disclosed by the State prior to the case going to trial." At the post-conviction hearing that occurred on April 24, 2015, Glumac testified that he received a copy of the ballistic report on June 9, 2009 via fax from ISP Scientist Leah Kane, but failed to forward the report to anyone. Judge Pittman (formerly Simmons) granted plaintiff's Petition for Post-Conviction Relief on June 26, 2015.

Plaintiff's second criminal trial was tried to the bench before Judge Pittman in November and January 2017. In February 2017 the judge concluded that there was insufficient proof beyond a reasonable doubt based on her assessment of the testimony of Eduardo and Yadira. In particular, she found that Eduardo's testimony had been impeached, and concluded that Yadira's testimony, in light of the alibi witnesses and the later use of the gun in a second shooting, was insufficient to find guilt beyond a reasonable doubt. Despite the ruling, neither Yadira nor

12

Eduardo has ever recanted their identification of plaintiff as the gunman who attacked their family. Specifically, Eduardo testified at his deposition in the instant case that "I was 100% sure it was him. I saw who I saw. Even though it happened really fast, I saw him."

## **DISCUSSION**

The defendants have moved for summary judgment on all remaining counts. Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether a genuine issue of material fact exists, the court must construe all facts and reasonable inferences in the light most favorable to the nonmoving party. See CTL ex rel. Trebatoski v. Ashland Sch. Dist., 743 F.3d 524, 528 (7th Cir. 2014). But the nonmovant "is only entitled to the benefit of inferences supported by admissible evidence, not those 'supported only by speculation or conjecture.'" Grant v. Trus. of Ind. Univ., 870 F.3d 562, 568 (7th Cir. 2017).

In Count I, plaintiff alleges that defendants violated his due process rights to a fair trial by: 1) using unduly suggestive techniques in obtaining Yadira's and Eduardo's identification of plaintiff as the shooter; 2) fabricating evidence in connection with the identifications; and 3) withholding exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963). Plaintiff has since withdrawn his claim that the photo arrays were unduly suggestive in any way. His fabrication of evidence claim is based entirely on Growe's May 27, 2008, police report that

13

indicated that while still on scene Yadira identified plaintiff as the shooter.  Both Growe and Rapacz testified to that identification at the motion to suppress, but Yadira has consistently maintained in the motion to suppress, the 2009 criminal trial, and in the instant case, that she first identified plaintiff at the hospital, the day after the shooting.

"The essence of a due-process evidence-fabrication claim is that the accused was convicted and imprisoned based on knowingly falsified evidence, violating his right to a fair trial and thus depriving him of liberty without due process.' Patrick v. City of Chicago, 974 F.3d 824, 835 (7th Cir. 2020).  A plaintiff advancing a due process fabrication of evidence claim has the burden to establish that the evidence was material, meaning that there was "a reasonable likelihood the evidence affected the judgment of the jury."  Id.

Even assuming that the officers' report and testimonies were false, plaintiff cannot meet his burden to establish that the report or testimony was material.  First, it is undisputed that Eduardo identified plaintiff at the scene.  More importantly, it is undisputed that both Yadira and Eduardo identified plaintiff at the hospital first by name, and then in a properly executed photo array.  Both also identified plaintiff at the trial, stated that they had known him for years, and were positive about their identifications.  Finally, there is no likelihood that the alleged fabricated evidence affected the judgment of the jury because Yadira testified that she first identified plaintiff at the hospital and the jury undoubtedly reached their verdict based on her and Eduardo's unwavering testimony and in-court identifications.  See e.g. Coleman v. City of Peoria, 925 F.3d 336, 349-50 (7th Cir. 2019) (Even if photo array was improper, it was immaterial because the witness repeatedly testified that she based her identification on her recognition of the defendant's face.).

The crux of plaintiff's due process claim is that defendants withheld evidence favorable to the defense in violation of Brady. In Brady, the Court held that a prosecutor's suppression of evidence favorable to the accused violated due process where the evidence is material to guilt or punishment. Brady, 373 U.S. at 87. Brady obligations apply to the police, who must disclose exculpatory or impeaching evidence to the prosecution, rather than directly to the defense. Carvajal v. Dominguez, 542 F.3d 561, 566 (7th Cir. 2008).

To establish a civil claim against a police officer for a Brady violation, a plaintiff must prove: 1) the evidence at issue is favorable to his defense; 2) the officer concealed the evidence from the prosecutors; and 3) the concealment prejudiced him. Coleman, 925 F.3d at 349. Prejudice is demonstrated by proving the evidence was material, which requires a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Id. A reasonable probability is one that is sufficient to undermine confidence in the outcome. Id.

Plaintiff's Brady claim predominantly asserts that defendants withheld two separate pieces of evidence from his defense attorney. The first is the ballistic report from ISP that indicated that the gun used in the Rostro shooting was later used in two separate shootings and recovered from Chavez. There is no doubt that this information should have been provided to the defense, as Judge Simmons held in the post-conviction proceeding. Neither Glumac nor the CCPO defendants dispute that proposition. As to the CCPO defendants, however, there is absolutely no evidence in the record that either Growe or Rapacz was ever aware of the report, and thus there is no evidence that either suppressed the evidence by failing to give it to Coppleson. Indeed, Glumac admitted that he failed to get the report to the detectives. Liability

15

under 42 U.S.C. § 1983 requires "personal involvement in the alleged deprivation." Johnson v. Rimmer, 936 F.3d 695, 710 (7th Cir. 2019). Consequently, plaintiff cannot establish a civil Brady violation against either Growe or Rapacz.

Glumac's position is slightly different, but ultimately ends in the same place. Glumac received the report and admittedly should have provided it to Growe and Rapacz, and to the prosecution. Glumac first argues that that the allegations in plaintiff's amended complaint are judicial admissions that destroy plaintiffs claim against him. In that complaint, plaintiff alleges that "[o]n May 19, 2009, Forensic Scientist Kane again contacted ASA Cordelia Coppleson and confirmed that the cartridge cases recovered on August 22, 2006, forensically matched the handgun recovered during the arrest of Nicholas Chaves [sic] on October 26, 2006." Plaintiff further alleges that "[a]pproximately three months prior to Plaintiff's jury trial, ASA Coppleson was aware that ISP forensic testing had confirmed that the cartridge casings recovered on August 22, 2006 were a ballistic match to the handgun fired on October 22, 2006, and retrieved from Nicholas Chavez on October 26, 2006."

"It is a well settled rule that a party is bound by what it states in its pleadings," and that "judicial admissions are formal concessions in the pleadings, or stipulations by the party or its counsel, that are binding upon the party making them." Help At Home Inc. v. Medical Capital, LLC, 260 F.3d 748, 754 (7th Cir. 2001). The Seventh Circuit has often noted that "a plaintiff can plead himself out of court by alleging facts which show that he has no claim, even though he was not required to allege those facts." Soo Line R. Co. v. St. Louis Southwestern Ry. Co., 125 F.3d 481, 483 (7th Cir. 1997). If plaintiff's allegations constitute judicial admissions, he has no claim against Glumac because the prosecutor alone is responsible for failing to disclose exculpatory

16

evidence in her possession.  Porter v. White, 483 F.3d 1294, 1308-09 (11th Cir 2007).

As noted above, plaintiff has attempted to back away from these allegations by denying them in his L.R. 56.1 response, arguing that the amended complaint was drafted less than five weeks after plaintiff was found not guilty at the retrial, and before he had received any documents in discovery in the instant case.  The court is not persuaded by plaintiff's attempts to ignore his pleading for two reasons.  First, although drafted just five weeks after he was acquitted, the amended complaint was drafted years after Coppleson testified in the post-conviction hearing that she had no pre-trial knowledge of the ballistics report.  Thus, plaintiff was well aware of Coppleson's position.  Additionally, the amended complaint remains the operative pleading in the case.  Plaintiff has made no effort to amend the complaint a second time, after receiving discovery that contradicted the allegations.  Consequently, the court concludes that plaintiff is bound by his judicial admissions and has failed to establish a civil Brady claim against Glumac based on the failure to disclose the ballistics report.

Moreover, even without the judicial admissions, plaintiff's claim against Glumac fails. In a criminal proceeding, a Brady violation occurs regardless of whether the government's conduct was intentional or inadvertent.  Brady, 373 U.S. at 87.  To recover damages in a § 1983 action for a civil Brady violation requires more.  As plaintiff admits, a civil due process claim requires proof that a defendant "acted intentionally, or at least recklessly."  Cairel v. Alderden, 821 F.3d 823, 832 n.2 (7th Cir. 2017).  There is simply no evidence in the record from which a reasonable jury could find that Glumac's actions were anything but a simple mistake. Negligence is insufficient to establish a civil Brady claim. Id.  Consequently, even without being bound to his judicial admissions, plaintiff's claim based on Glumac's failure to disclose the

ballistics report fails.

The second piece of evidence that plaintiff claims defendants failed to disclose is Yadira's identification of Loera as present at the shooting, and her identification of Loera from a photo array. This information was material and at least impeaching, and should have been disclosed. It is unclear why this identification did not make it into a report and why the photo array was not given to the prosecution. But, a Brady violation occurs when the prosecution fails to disclose evidence "unknown to the defendant." U.S. v. Lee, 399 F.3d 864, 865 (7th Cir. 2005). The record undisputedly reveals that defense counsel Celani was aware that Yadira had identified Loera as with the shooter, and that Loera and his girlfriend Amanda Torres had been arrested and questioned for 26 hours before being released. Plaintiff argues that had he known this, plaintiff would have focused on establishing that Loera was the shooter since he had motive (having a relationship with Eduardo's ex-girlfriend), opportunity, and means (Loera arguably fired the same weapon at the earlier shooting). But he did know all of this, as established by the sworn statements of Dolata, Powell, and Torres taken by his defense attorney prior to trial. Celani specifically asked those witnesses whether they were aware that Loera and Torres had been arrested and questioned. Moreover, the blueback notes prepared by Voight and reviewed by Coppleson indicate that another male and female were taken into custody because there was information that they drove plaintiff to the Rostro home. Coppleson's notes identified Loera and Torres. Thus, it was Coppleson's, not defendants' responsibility to disclose that information. As a result, the court concludes that defendants are entitled to summary judgment on Count I.

Plaintiff's remaining counts fare no better. Count IV asserts a state law claim for malicious prosecution, which requires proof: 1) that defendants commenced or continued an

18

original criminal or civil proceeding; 2) termination of the proceeding in favor of the plaintiff; 3) the absence of probable cause for such proceeding; 4) the presence of malice; and 5) damages resulting to the plaintiff.  Swick v. Liautaud, 169 Ill.2d 504, 512 (1996).  Failure to establish any one of the five elements is fatal to the claim.  Beaman v. Freesmeyer, 2019 IL 122654, ¶ 26 (2019).  In the instant case, the prosecution was commenced by Voigt approving charges after interviewing Eduardo and Yadira and speaking with plaintiff.  There is no evidence that the officers put any pressure on the ASAs to commence the case.

Additionally, there was undoubtedly probable cause to prosecute plaintiff based on Yadira and Eduardo's unwavering identification of plaintiff as the shooter.  They both gave plaintiff's name and picked him out in an unchallenged photo array.  These facts are sufficient to lead an ordinary person of ordinary caution and prudence to believe, or entertain an honest and strong suspicion, that the person arrested committed the offense charged.  Johnson v. Target Stores, Inc., 341 Ill. App. 3d 56, 72 (1st Dist. 2003).  And, plaintiff was indicted by a grand jury, which creates a rebuttable presumption of probable cause, which plaintiff can overcome only by demonstrating that the indictment was obtained by false or fraudulent testimony before the grand jury.  Wade v. Collier, 783 F.3d 1081, 1085-86 (7th Cir. 2015).  Plaintiff has not presented any evidence to rebut the presumption.

Finally, plaintiff has presented no evidence that defendants harbored any malice or improper motives toward plaintiff.  There is no evidence that any of the individual defendants had any contact with plaintiff prior to his arrest, and plaintiff has admitted that Yadira and Eduardo identified plaintiff without any suggestion from defendants.  Consequently, the court concludes that defendants are entitled to summary judgment on Count IV, plaintiff's claim for

malicious prosecution.

Count VI alleges a state law claim for civil conspiracy, which requires proof of:1) an agreement between two or more persons; 2) to participate in an unlawful act, or a lawful act in an unlawful manner; 3) an injury caused by an unlawful overt act of one of the parties; and 4) the overt act was performed pursuant to and in furtherance of the common scheme. Vance v. Chandler, 231 Ill. App. 3d 747, 750 (3rd Dist. 1992). In the instant case, plaintiff has presented no evidence of any agreement or scheme among the defendants or between the defendant officers and the prosecutors to violate plaintiff's rights. Consequently, the court concludes that defendants are entitled summary judgment on Count VI.

Finally, Counts VII and VIII brought against Calumet City for respondeat superior liability and indemnity are dependent on plaintiff prevailing on his other counts, Calumet City is entitled to summary judgment on these counts as well.

## CONCLUSION

For the reasons described above, Glumac's motion for summary judgment [Doc. 183] and the CCPO defendants' motion for summary judgment [Doc. 186] are granted.

**ENTER:**

**Robert W. Gettleman**
**United States District Judge**

**DATE: July 7, 2021**